IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| KEVAN FRANCIS and REBECCA IVES, Individually, the Natural Parents of S.I., Deceased; TIM MULVEY and REBECCA IVES, Individually and on Behalf of their Minor Child, J.M.,<br><br>Plaintiff s,<br><br>v.<br><br>UNITED STATES OF AMERICA, USDA FOREST SERVICE, and JOHN DOES I-X,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER<br><br>Case No.  2:08cv244DAK |

This matter is before the court on the United States of America's Motion to Dismiss.  A hearing on the motion was held on November 19, 2008.  At the hearing, the United States was represented by Amy J. Oliver and Jeffrey E. Nelson.  Plaintiffs were represented by Allen K. Young, Tyler S. Young, and Sarah H. Young.  Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties.  Since taking the motion under advisement, the court has further considered the law and facts relating to the motion.  Now being fully advised, the court renders the following Memorandum Decision and Order.

1

## INTRODUCTION

At issue in the instant motion is whether the United States is immune from suit for its alleged role in failing to prevent a tragic and fatal bear attack of a minor boy, S.I., who was camping in American Fork Canyon with his family during the night of June 17, 2007.

In the early morning hours of June 17, 2007, another camper, Jake Francom, had reported an aggressive bear at the very campsite at which SI's family later stayed. Based on Mr. Francom's report, state and federal officials determined that the bear was a Level III–the most dangerous level–nuisance bear that had to be found and destroyed. They searched for the bear with hounds but called off the search late in the afternoon. Unfortunately, no further actions were taken, and the campground and specific campsite remained open. No one posted notices about the Level III bear, nor did anyone attempt to notify potential users of the campsite regarding the imminent danger presented by the bear. Around 6:00 p.m., Plaintiffs, along with S.I., arrived at the same campsite to camp for the night. Tragically, the bear returned sometime before midnight, ripped the tent in which S.I. was sleeping, and pulled S.I. out of the tent, fatally wounding him. On the following day, the bear was located and euthanized.

Plaintiffs, who are S.I.'s parents, have asserted a negligence claim based on the government's failure to close the campsite or provide some type of warning. In this motion, the United States argues that Plaintiffs' negligence claim must be dismissed

pursuant to Federal Rule of Civil Procedure 12(b)(1) because, it contends, the action is barred by the "discretionary function" exception to the Federal Tort Claims Act ("FTCA"), and therefore the United States is immune from suit. Plaintiffs, however, disagree that the government's actions were protected by the discretionary function exception of the FTCA because no decision was actually made and no policy considerations were at issue in making–or failing to make–a decision about warning potential campers of this specific, known risk. The court agrees with Plaintiffs that, given the specific facts of this case, the discretionary function exception to the FTCA does not shield the United States from suit in this action, and therefore, the United States' motion to dismiss is denied.

## I. FACTUAL BACKGROUND[1]

A. The Camping Area at Issue

The Timpooneke Campground (the "Campground") is located in a mountainous area next to the Mt. Timpanogos Wilderness Area in American Fork Canyon, within the Uinta National Forest (the "Forest"). It provides many services, including fire rings, grills, picnic tables, restrooms, and water. The fee for a single campsite in 2007 was

---

[1] The parties agree that because this is a factual attack on the sufficiency of the jurisdictional averments, the court may look beyond the allegations in the Complaint, and it has wide discretion to allow documentary and testimonial evidence under Rule 12(b)(1). *Paper, Allied Indus., Chem, & Energy Workers Intern'l Union v. Continental Carbon Co.*. 428 F.3d 1285, 1292 (10th Cir. 2005).

$13.00.

"Dispersed camping" is also allowed in the Forest.  Dispersed camping is the term used for camping anywhere in the Forest that is outside of a developed campground. Dispersed campsites have no toilets, no treated water, and no fire pits or fire grates. There is no fee involved with camping in a dispersed site.   Such areas exist because many people enjoy the solitude and primitive experience of camping away from developed campgrounds and other campers.

Signs warning that Utah is bear country are located throughout the Forest.  One such sign was located on the bulletin board at the Tank Canyon pull-out on the road up American Fork Canyon toward the Timpooneke Campground.  The sign provides guidelines concerning bears that people should follow while in the Forest.   Another general warning sign was located at the entrance to the Timpooneke Campground. Additional warnings about bears are contained on the Forest website.

B.  The Events of June 17, 2007

On June 17, 2007, the Utah County Sheriff's Office Dispatch received a call from Jake Francom, who reported that he had encountered a bear earlier that morning–at approximately 5:30 a.m.–while camping in a dispersed campsite (the "Campsite") in an area above Mutual Dell in American Fork Canyon.  Mr. Francom reported that the bear "stomped" on one person's head, hit a camper at least twice, and then sliced into the side of a tent and put a paw through a camper's pillow.   The bear had also damaged his

cooler.  He and his friends were able to scare the bear away.

The dispatcher stated that both the Utah Division of Wildlife Resources (the "Utah DWR") and federal Forest Service officials would be contacted.  Thus, both the federal and state authorities were quickly notified of this incident.  By no later than 10:13 a.m., an official from the federal Wildlife Specialist of the USDA was fully informed of the situation and had agreed to jointly deal with state officials in addressing the problem.

Pursuant to the Memorandum of Understanding between the USDA Forest Service, Intermountain Region, and the Utah DWR, the Utah DWR made the decision that day to classify the bear reported by Mr. Francom as a "Level III nuisance bear," which is the most dangerous category, and a Level III bear incident is considered to present "a threat to public safety."  Pursuant to Utah State policy regarding the handling of black bears, the Utah DWR then proceeded to search for the bear in order to destroy it.

The bear was pursued by two individuals–one from Utah DWR and a United States Wildlife Specialist, who brought dogs to help track the bear.  The bear was tracked for approximately four and a half hours, but without success.  The trackers decided at that point to resume the search the next day.  No action was taken to close or restrict access to the Campsite or to warn prospective users of the Campsite.  The federal Forest Supervisor stated after the attack that "he is the only person who can close a campground and was not given the opportunity to make that call."

At approximately 6:00 p.m. on June 17, 2007, Plaintiffs arrived at the

Timpooneke Campground, intending to camp there. They stopped at the designated United States Forest Service ranger booth and pay station. They paid the fee required to travel and camp in the Forest area. Plaintiffs, however, did not have cash to pay the additional $13.00 fee charged for camping within the Timpooneke Campground. Consequently, Plaintiffs left the Campground in search of a campsite above the Timpooneke Campground, for which there was no additional fee.

At the ranger booth and pay station, no one mentioned anything about the bear attack earlier that morning. On their way to the campsite, Plaintiffs passed a DWR pick-up truck with two occupants who waived at Plaintiffs, but they did not provide any information about the bear attack. After Plaintiffs pitched their tent, they cleaned up cans, wrappers, and other garbage left by previous campers, and then they put all of their coolers in their locked car and went to bed around 9:00 p.m.

Although the Campsite is not a formally developed campground, it is a well-established tent campsite. It is located right beside Forest Service Road 056, and it has an established fire pit, a place to park a car, and a flat area for pitching a tent. When Plaintiffs arrived, there was also cut and stacked kindling wood and logs for seating. The only way to access the Campsite is by driving first to the Timpooneke Campground, past a Forest Service booth at the entrance to that campground, and then continuing on Forest Service Road 056, which is a dirt road at that point. It is a dead-end road, and there is a gate at the entrance to the section just as one leaves the Timpooneke Campground. If the

gate is closed, there is no access to the Campsite.  The Campsite is located about one mile beyond the Timpooneke Campground, and it is the first available campsite after the Timpooneke Campground.

The existence of the Campsite was known to federal officials.  An employee of the Forest Service concessionaire that manages the Timpooneke Campground stated that when he spoke with Plaintiffs' camping party, they asked whether they could use the Campsite, and he responded that it was "open."

Later that night, at approximately 11:00 p.m., Plaintiff Tim Mulvey contacted Mr. Sheely, the campground manager at the Timpooneke Campground, and reported that someone had cut open their tent and taken his stepson, S.I.  Mr. Sheely immediately drove to the Timpanogos Cave National Monument to call the Utah County Dispatch to report the incident.  S.I was later found deceased, and it was apparent that his injuries were consistent with a bear attack.  The bear believed to be responsible for the death of S.I. was tracked and killed on June 18, 2007.

C.  Relevant Statutes, Regulations, and Policies of the Forest Service

Federal statute establishes that the "national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528.  The Secretary of Agriculture is "directed to develop and administer the renewable surface forests for multiple use." 16 U.S.C. § 529.  Forest Service regulations establish that the "overall goal of managing the N[ational] F[orest]

S[ystem] is to sustain the multiple uses of its renewable resources in perpetuity while maintaining the long-term productivity of the land. Resources are to be managed so they are utilized in the combination that will best meet the needs of the American people." 36 C.F.R. § 219.1(b). Forest Service regulations further provide that in the context of wildlife management, the Forest Service "may enter into such general or specific cooperative agreements with appropriate State officials" to secure and maintain "desirable populations of wildlife species." 36 C.F.R. § 241.2.

Title 2300 of the Forest Service Manual ("FSM") sets forth the guidelines for "Recreation, Wilderness, and Related Resource Management." Section 2302 of the FSM identifies the "OBJECTIVES" to be achieved by managing recreation and wilderness as:

1. To provide nonurbanized outdoor recreation opportunities in natural appearing forest and rangeland settings.

2. To protect the long-term public interest by maintaining and enhancing open space options, public accessibility, and cultural, wilderness, visual, and natural resource values

3. To promote public transportation and/or access to National Forest recreation opportunities.

4. To shift land ownership patterns as necessary to place urbanized recreation settings into other ownerships to create more public open space and/or natural resource recreation values.

5. To provide recreation opportunities and activities that:
   a. Encourage the study and enjoyment of nature;
   b. Highlight the importance of conservation;
   c. Provide scenic and visual enjoyment; and
   d. Instill appreciation of the nation's history, cultural resources, and traditional values.

In addition, Section 2330 of the FSM governs "Publicly Managed Recreation Opportunities." Section 2330.2 of the FSM identifies the Objective of developing and managing Forest Service recreation sites and facilities as follows:

1. To maximize opportunities for visitors to know and experience nature while engaging in outdoor recreation.

2. To develop and manage sites consistent with the available natural resources to provide a safe, healthful, esthetic, non-urban atmosphere.

3. To provide a maximum contrast with urbanization at National Forest System sites.

Section 2332, which governs Public Safety at developed recreation sites, provides:

To the extent practicable, eliminate safety hazards from developed recreation sites. Inspect each public recreation site annually before the beginning of the managed-use season. Maintain a record of the inspections and corrective actions taken with a copy of the operation and maintenance plan.

Immediately correct high-priority hazards that develop or are identified during the operating season or close the site.

FSM 2300, Chapter 2330 identifies only two types of hazards: tree hazards (2332.11) and other natural hazards. With regard to other natural hazards at developed recreation sites, the FSM provides the following:

If practicable, correct known natural hazards when a site is developed and open for public use. If the hazards remain or new natural hazards are identified, take steps to protect the public from the hazards. Tailor the action taken to each hazardous situation. Consider posting signs, installing barriers, or, if necessary, closing the site to address concerns of public safety.

## II.  DISCUSSION

It is well settled that the United States, as a sovereign entity, "is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain that suit."  *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981) (quoting *United States v. Testan*, 424 U.S. 392, 399 (1976)).  Thus, suit against the United States can be entertained only when Congress has specifically waived the United States' immunity.  *See id.*  Furthermore, such waiver of sovereign immunity cannot be implied; it must be unequivocally expressed.  *See Franconia Assocs. v. United States*, 536 U.S. 129, 141 (2002).

The FTCA is a limited waiver of the United States' sovereign immunity.  The FTCA's waiver of immunity is limited to causes of action against the United States arising out of certain torts committed by federal employees acting within the scope of their employment.  *See United States v. Orleans*, 425 U.S. 807, 813 (1976).  Because the FTCA is only a limited waiver of the United States' sovereign immunity, it is subject to a number of exceptions.  *See, e.g.*, 28 U.S.C. §§ 1346(b) and 2680; *Orleans*, 425 U.S. at 813.  These exceptions are to be "strictly observed and exceptions thereto are not to be implied."  *Lehman*, 453 U.S. at 160 (quoting *Soriano v. United States*, 352 U.S. 270, 276 (1957)).

One of the exceptions to the jurisdiction granted by the FTCA is the "discretionary function exception,"  28 U.S.C. § 2680(a).  *See United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 809 (1984).  The burden is on

Plaintiffs to prove that their claims are not based upon actions immunized from liability under the discretionary function exception. *See Elder v. United States*, 312 F.3d 1172, 1176 (10th Cir. 2002). The discretionary function exception precludes the imposition of liability against the United States for conduct "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Elder*, 312 F.3d at 1176 (internal quotations and citation omitted). The exception applies regardless of whether the government agent was negligent in his duties, so long as his duties were discretionary. *See Dalehite v. United States*, 346 U.S. 15, 32 (1953); *Lopez v. United States,* 376 F.3d 1055, 1057 (10th Cir. 2004).

Analysis of the discretionary function exception is a threshold jurisdictional issue, and "it is irrelevant whether the government employees were negligent." *Elder*, 312 F.3d at 1176. Because the waiver of sovereign immunity is jurisdictional, the court lacks subject matter jurisdiction over a claim that falls within the discretionary function exception. *Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998). To determine the applicability of the discretionary function exception, courts employ a two-part test. *See United States v. Gaubert*, 499 U.S. 315, 322-23 (1991); *Berkovitz*, 486 U.S. at 536-37; *Elder*, 312 F.3d at 1176. First, a court must determine whether the challenged

conduct at issue involved a matter of judgment or choice. *See Berkovitz*, 486 U.S. at 536. The discretionary function exception does not apply if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" and "the employee has no rightful option but to adhere to the directive." *Gaubert,* 499 U.S. at 322. The standards set forth by federal statute, regulation, or policy will bar the application of the discretionary function exception only if such standards are "both specific and mandatory." *Aragon*, 146 F.3d at 823. It is the nature of the conduct that is at issue, not whether the conduct may have been negligent. *Gaubert*, 499 U.S. at 321.

Second, if the challenged conduct involves an element of judgment, a court must next "determine whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz,* 486 U.S. at 536. The discretionary function exception "protects only governmental actions and decisions based on considerations of policy." *Id*. Congress specifically enacted the discretionary function exception "'to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Id*. at 537 (quoting *Varig Airlines,* 467 U.S. at 814) (emphasis added).

"When established governmental policy, as expressed or implied by statute, regulation or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. To avoid dismissal, Plaintiffs "must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said

to be grounded in the policy of the regulatory regime." *Id*. at 324-25. "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id*. at 325.

In this case, the parties do not disagree as to the law, but as to whether the actions at issue in this case were discretionary under the two prongs of the above-mentioned test, commonly referred to as the "*Berkovitz* test." In short, the United States claims that both prongs of the *Berkovitz* test have been satisfied, and thus, that its decision was discretionary. Consequently, it argues that the United States is immune from suit, and this action must be dismissed.

Plaintiffs, on the other hand, claim that the United States cannot satisfy either prong of *Berkovitz*. First, they claim that there was a specific policy applicable to the actions of the United States, and thus, no discretion was involved. Second, they claim that even if there was discretion involved, the failure to close the Campsite or otherwise keep campers from using the Campsite until the bear was destroyed did not involve the type of public policy decision that is protected by the discretionary function doctrine.

**A.** <u>*First Prong of Berkovitz*</u>**:**

To prevail on the first prong, Plaintiffs must demonstrate that the challenged decisions involved "no 'element of judgment or choice.'" *Elder*, 312 F.3d at 1176-77 (quoting *Kiehn v. United States*, 984 F.2d 1100, 1102 (10th Cir. 1993)). To do so, they must show that Forest Service "employees violated a federal statute, regulation, or policy

that is both 'specific and mandatory.'" *Id*. at 1177 (quoting *Aragon*, 146 F.3d at 823).

Plaintiffs argue that Utah has an extensive regulation (the "Regulation") describing what to do when there is a nuisance bear at large:

> Division employees should request that land management agencies close or restrict the use of campgrounds where nuisance black bears are active until the source of the problem (attractant) has been removed and/or the offending bear has been removed.

Plaintiffs, thus, claim that both state and federal authorities failed to implement the part that required keeping attractants –campers and their food –away from the Campsite until the bear had been destroyed. In light of the word "should," however, the court cannot conclude that this Regulation mandates a specific course of action.

Plaintiffs also claim that a Forest Service policy independently establishes that, at a minimum, the Forest Service was required to post warning signs after the first bear attack at the Campsite. Specifically, the Forest Service Manual provides:

> If practicable, correct known natural hazards when a site is developed and open for public use. If the hazards remain or new natural hazards are identified, take steps to protect the public from the hazards. Tailor the action taken to each hazardous situation. Consider posting signs, installing barriers, or, if necessary, closing the site to address concerns of public safety.

The court, however, cannot conclude that this policy sets forth a mandatory course of action that should have been followed in this case.[2] The court finds that there is no statute, regulation, or agency policy mandating the precise manner in which the United

---

[2] The Government points out that "determining what is *practicable* requires the exercise of discretion." *Rosebush v. United States*, 119 F.3d 438, 442 (6th Cir. 1997).

States should have managed this situation.  This determination, however, does not end the court's inquiry.   Plaintiffs may still establish that the United States' actions are not protected by the discretionary function exception if, under the second *Berkovitz* prong, Plaintiffs can demonstrate that the challenged conduct was not the type of conduct that the discretionary function exception was designed to shield, as more fully explained below.

B.      *Second Prong of Berkovitz*

To prevail on the second prong of *Berkovitz* and avoid dismissal, Plaintiffs "must allege facts [that] would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Gaubert*, 499 U.S. at 324-25.  According to the United States, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.  The Government argues that Plaintiffs cannot overcome this presumption.

The United States also cites to cases from numerous courts, including the Tenth Circuit and this court, which, the Government claims, have found similar decisions to fall within the discretionary function exception.   For example, in *Gadd v. United States*, 971 F. Supp. 502, 509 (D. Utah 1997), this court found that the decision not to warn of black bears involved "balancing of considerations of resource management and safety along with how best to handle safety concerns when absolute safety is not possible." Similarly, the United States relies on *Elder v. United States*, 312 F.3d at 1181-84 (10th Cir. 2002), in which the court granted immunity under the discretionary function test,

15

finding that a decision not to provide additional warnings required the National Park Service to balance safety, access, cost, preservation of natural resources and aesthetic values, and the likely benefit of additional signage, and thus was protected.

These cases, however, are distinguishable from the case at bar in that they did not involve an immediate, known risk, specific in time and location. For example, in *Gadd*, a camper was severely injured by a bear attack in a United States Forest. The plaintiff alleged that the injury was due to negligence in the government's management of that national forest. The court relied on the following facts: a black bear had never before been seen on the peninsula where the campground at issue was located; the peninsula was uninviting to bears and a poor quality bear habitat at best, in contrast to the area across the reservoir where ample cover and food sources existed; the only bear sighting ever in the larger area was across the reservoir, and that sighting was two years before the attack at issue; the offending bear had been killed, and there had been no more bear sightings.

Accordingly, the court held that the decision whether to post warning signs would be discretionary "where a hazard such as bears is not a known natural hazard directly associated with a particular site." *Id.* Thus, the court agreed with the United States that Forest service decisions regarding the matters complained of in *Gadd* were "grounded in diverse public policies and involve balancing of considerations of resource management and safety along with how best to handle safety concerns when absolute safety is not possible." *Id.* at 509.

No case cited by the United States addresses a situation similar to the instant case

in which the handling of a very specific, immediate, known risk was being considered, as opposed to a general risk of recreating in wilderness areas. The facts involved in the cases cited by Plaintiffs are much more similar to the instant case, rendering their holdings to be more persuasive –if not controlling.

For example, in *Smith v. United States*, 546 F.2d 872 (10th Cir. 1976), a visitor to Yellowstone National Park was injured when he fell into a thermal pool. The thermal pool in question was in an undeveloped area, in that it had no boardwalk or other amenities, but there was a parking area very close to it, and a well-worn path to the pool. The court held that the decision to leave the area undeveloped was discretionary, but that the decision to place no warning signs by the pool was not. *Id.* at 877 ("The Government's decision . . . not to warn of the known dangers or to provide safeguards cannot rationally be deemed the exercise of a discretionary function.").

Also, in *Boyd v. United States*, 881 F.2d 895 (10th Cir. 1989), the government allowed both boating and swimming in a section of a lake, and a swimmer was killed by a passing boat. The court held the decision to zone that section of the lake to allow both boating and swimming was immunized by the discretionary function doctrine, but the decision to place no warnings of any kind for swimmers was not. *Id.* at 898.

It is helpful to specifically compare two Tenth Circuit cases, the first pertaining to a generalized risk and the second to a specific risk. First, in *Zumwalt v. United States*, 928 F.2d 951 (10th Cir. 1991), a hiker was injured when he left a marked trail and fell into a cave. The Tenth Circuit held that the negligence claim was barred by the discretionary

function doctrine because "the absence of warning signs was part of the overall policy decision to maintain the Trail in its wilderness state." *Id.* at 955.

In contrast, in *Duke v. Department of Agriculture*, 131 F.3d 1407 (10th Cir. 1997), a camper was injured when a boulder rolled down a hillside and smashed into his tent. The plaintiffs were camping near a dam. The construction of a state road had created a risk of boulders rolling down a particular hill. The plaintiffs were not in a developed campsite, but rather on the other side of the road from a developed campsite. In *Duke*, the Forest Service admitted that although there were no signs designating the spot for camping, camping had always been allowed there, as reflected in the fact that there was an existing fire ring. *Id.* at 1409-10.

The *Duke* court ruled that the failure to provide any warning of this risk was not protected by the discretionary function doctrine because, in contrast to other failure-to-warn cases, this situation involved a specific, known risk, and there were no public policy considerations at issue. *Id.* at 1411. The court contrasted the generalized risks of the wilderness and the public policy considerations that go into keeping an area pristine, with those cases in which the court had found that a failure to warn did not involve a public policy type of decision:

> In each of these cases the court could not perceive in the record before it any significant social, economic or political policy in the action or inaction that allegedly contributed to the injury giving rise to the lawsuit. In these cases a specific hazard existed, distinct from the multitude of hazards that might exist in, for example, a wilderness trial through a national park or forest, where warnings might detract from the area's character or safety structures might be costly.

*Id*.

In the instant case, the bear that had earlier attacked campers at that very Campsite presented a "specific hazard, distinct from the multitude of hazards that might exist in . . . a wilderness," *id.*, similar to the situation in *Duke*. It is difficult to conceive of what policy considerations could have been at play in failing to keep campers away from that Campsite while the bear was being tracked–or failing to at least warn campers about the situation. Moreover, the evidence set forth thus far in this litigation demonstrates, tragically, that no decision was ever actually made about how to handle this threat to public safety. The government official with the authority to close the Campsite stated that he was never given the opportunity to make that call. Plaintiffs contend, and the court agrees, that this was a simple and tragic failure to act, which does not fall under the discretionary function exception to the FTCA.

Even if a decision had been made (*i.e.*, to do nothing), such a decision is simply not susceptible to a policy analysis, and thus fails the second prong of the *Berkovitz* test. There was no significant social, economic, or political policy involved in failing to warn campers of the specific risk at issue here. "Decisions that require choice are exempt from suit under the FTCA only if they are "susceptible to policy judgment and involve an exercise of political, social, [or] economic judgment." *Gaubert*, 499 U.S. at 325. As the Tenth Circuit has eloquently pointed out, the government can almost always argue

> that decisions–or nondecisions–that involve choice and any hint of policy
> concerns are discretionary and within the exception. We agree with the
> D.C. Circuit that "[t]his approach . . . would not only eviscerate the second
> step of the analysis set out in *Berkovitz* and *Gaubert*, but it would allow the
> exception to swallow the FTCA's sweeping waiver of sovereign immunity."

19

*Duke* 131 F.3d 1407, 1411 (10th Cir. 1997) (quoting *Cope v. Scott,* 45 F.3d 448, 449 (D.C. Cir. 1995)).

Here, there was known danger– specific in time and location.  No policy judgment was involved, nor was there an exercise of political, social, or economic judgment.  There might have been a different outcome to this motion had the earlier bear attack happened several miles away or several days or weeks before, but such a scenario is not before the court.  In this case, United States officials knew that an aggressive bear had been present at the Campsite earlier that day–and those officials had decided that the bear was dangerous enough that it need to be tracked and euthanized.  When the bear was not found that afternoon, no other action was taken–and there is no evidence of any discussion about what might have been done.  Tragically, S.I. and his family later set up camp at that very site.  The court finds that the United States' failure to take any precautionary measures regarding the Level III bear, which was still on the loose, does not fall under the discretionary function exception to the FTCA.  Accordingly, the United States is not immune from suit, and its motion to dismiss is denied.

## CONCLUSION

Accordingly, IT IS HEREBY ORDERED that the United States of America's Motion to Dismiss [docket #6] is DENIED.

DATED this 30th day of January, 2009.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge