**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **KEVAN FRANCIS and REBECCA IVES, Individually, the Natural Parents of S.I., deceased,**<br><br>**Plaintiffs,**<br><br>**vs.**<br><br>**UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER**<br><br><br>**Case No.  2:08CV244 DAK** |

This heart-wrenching case was heard by the court in a five-day bench trial held on February 7-11, 2011.  Plaintiffs Kevan Francis and Rebecca Ives ("Plaintiffs") were represented by Allen K. Young and Tyler S. Young.  Defendant United States of America ("Defendant") was represented by Assistant United States Attorneys Jeffrey E. Nelson and Amy J. Oliver.  Having considered the testimony of the witnesses and the evidence admitted at trial, the relevant authorities on the legal issues presented, and the proposed findings of fact and conclusions of law submitted by the parties, the court now renders the following Findings of Fact and Conclusions of Law and Order.

## BACKGROUND

Late at night on Father's Day, June 17, 2007, in American Fork Canyon, eleven-

year-old Sam Ives was dragged from his family's tent and killed by a black bear.[1]

Earlier that morning, at the same campsite occupied by Sam, his mother, his brother, and his step-father (the "Mulvey Family"), the bear had aggressively opened coolers, found food, slashed through a camper's tent, and struck another camper in the head several times before being chased off. The Mulvey Family had no knowledge of this aggressive bear encounter at that same campsite approximately twelve hours before their arrival.

Plaintiffs, who are Sam's biological parents, have sued the United States under the Federal Tort Claims Act ("FTCA").[2] Plaintiffs claim that their son's tragic death was caused by the negligence of employees of the United States Forest Service.[3] Specifically, Plaintiffs allege that Forest Service employees were aware of the presence

---

[1] While the names of minors are generally not used in court proceedings, during the bench trial, Plaintiffs requested permission to use Sam's name because his name had already been used extensively in the media. The court granted Plaintiffs' request during the trial, and, accordingly, the court will also use Sam's name, rather than his initials.

[2] On February 13, 2009, Rebecca Ives and Tim Mulvey, Sam's step-father, filed a Stipulation to Dismiss their claims on behalf of their minor child, J.M., Sam's brother. The court granted the dismissal on February 18, 2009. See Docket Nos. 22, 24.

[3] Plaintiffs also claim that the State of Utah, through the Utah Division of Wildlife Resources, is at fault. Because the state is immune from suit in federal court under the Eleventh Amendment to the United States Constitution, Plaintiffs have filed a separate lawsuit against the state in Third District Court for the State of Utah.

Under Utah's Comparative Fault statute and the United States' Notice of Allocation of Fault, see Docket No. 35, this court must allocate fault among all negligent actors, whether or not they are parties to this lawsuit.

of a dangerous bear in the area and negligently failed to (1) warn campers of the

presence of a dangerous bear; or (2) close the remote camp site.  The United States

denies that its employees were negligent in the manner alleged by Plaintiffs or that any

act or omission of its employees proximately caused Sam's death.  It also contends

that, in any event, it is immune from suit under the discretionary function exception to

the FTCA.[4]  If it is found negligent, the United States seeks to allocate fault to the State

of Utah and to the Mulvey family.

## FINDINGS OF FACT

1.      The court enters these findings of fact based on a preponderance of the

        evidence.  In assessing the credibility of the witnesses, the court has considered

        the source and basis of each witness's knowledge; the ability of each witness to

        observe; the strength of the witness's memory; each witness's interest, if any, in

        the outcome of the litigation; the relationship of each witness to either side in the

        case; and the extent to which each witness's testimony is either supported or

        contradicted by other evidence presented at trial.

2.      Plaintiffs Kevan Francis and Rebecca Ives are the natural parents of Samuel

        Ives, a child who was attacked and killed by a bear while camping in the Uintah

        National Forest, which is United States forest land managed by the United States

---

[4]  The court previously denied the United States' Motion to Dismiss on this
ground, finding that the discretionary function exception to the FTCA did not apply in
this specific situation.  *See* Memorandum Decision and Order, dated January 30, 2009,
Docket No. 21.

Forest Service.

3.   On June 16, 2007, Jake Francom and friends camped in a dispersed camping area in the Uintah National Forest approximately 1.2 miles above the Timpooneke Campground.  A "dispersed" camping area is outside of a designated campground and has no water or bathroom facilities.

4.   The camping area used by Mr. Francom and his friends was a frequently used campsite, and was one of only a few popular campsites on the dead-end road called "Timpooneke Road 056."  This particular campsite was often occupied.

5.   Although the campsite was in a dispersed area outside the Timpooneke Campground, it had a fire pit, log bench, a flat area for tents, and room for a car to pull off the road.

6.   The only public access to the campsite or any other campsite on Timpooneke Road 056 was through the Timpooneke Campground.  There is a gate above the Timpanookee Campground, which is generally closed for the winter until approximately Memorial Day.

7.   The United States Forest Service was responsible for managing Timpooneke Road 056 and the campsites along that road.

8.   At around 5:30 a.m. on June 17, 2007, Jake Francom was attacked by a bear while sleeping in his tent.[5]

---

[5] The parties disagree about whether Mr. Francom's bear encounter should be called an "attack."  While reasonable minds may disagree about the proper characterization of the events that occurred that morning, the label used by the court is not material to the outcome of this case.  For ease of reference, the court will refer to

9.      Mr. Francom was sleeping against one side of his tent, and he awoke to a bear

striking his head from outside the tent.[6]  The bear struck him at least twice.

Then, when Mr. Francom sat up, the bear's claw pushed him down again, and

the bear's paw slashed the tent.  The bear also took his pillow from the tent and

slashed the pillow.

10.     Mr. Francom yelled to his friends, who were sleeping in nearby tents, to get a

gun.

11.     Mr. Francom and his friends exited their tents and scared the bear away with

pistol shots.  When the bear was approximately fifty (50) yards away, it sat down

and looked at Mr. Francom and his friends for approximately 15-20 seconds.

Mr. Francom was able to see that the bear was a large, cinnamon-colored black

bear.  After the individuals threw rocks at the bear, it ran off.

12.     Mr. Francom and his friends noticed that the bear had raided and damaged the

coolers around the camp.  Mr. Francom did not have food or drink in his tent.

13.      Mr. Francom reported the bear attack to Utah County Dispatch at 9:25 a.m. on

June 17, 2007.  During this call, Ms. Paula Youd, the dispatcher who took the

---

the events of that morning as either an "aggressive bear encounter" or a "bear attack."

[6] Various descriptions have been used to describe the bear's action regarding Mr. Francom's head, including "stomped on," "hit," brushed," "patted," and "beat."  For consistency, the court will refer to the bear's action as "hitting" Mr. Francom.  As described below, regardless of the term used, the Utah Department of Wildlife Resources ("DWR") classified the bear as a "Level III" nuisance bear that was required to be euthanized because of its threat to public safety.  This Level III classification was given to the bear even though DWR had received information that the bear "patted" Mr. Francom on the head, and DWR also did not know about the bear's slashing the tent or the pillow.

5

call, told Mr. Francom that she would notify the Forest Service and that Mr.

Francom would also need to call the highway patrol to notify the DWR. Mr.

Francom called the highway patrol, and the DWR was notified of the incident.

14. Dispatcher Paula Youd reported the incident to United States Forest Service law enforcement officer ("LEO") Carolyn Gosse at her home at 9:44 a.m. on June 17, 2007.

15. Ms. Youd told Ms. Gosse about Mr. Francom's phone call and gave Mr. Francom's phone number to Ms. Gosse. Specifically, Ms. Youd told Ms. Gosse that someone had called to report a bear attack, saying that it did not injure anybody, but it did some damage, such as slashing the side of a tent and getting a pillow and the coolers.

16. Ms. Gosse said that she would let her district know. Ms. Gosse, also stated that she was not on duty and that it would be impossible to find someone to watch her children on a Sunday.

17. In proceedings brought by the United States Department of Agriculture to terminate Ms. Gosse, based in part on her conduct with respect to this incident, Defendant acknowledged that the following Forest Service regulations applied to this situation:

- The employee must remain on or return to duty not because of personal preference, but because of compelling reasons to continue the employee's duties when failure to carry on such duties would constitute negligence. Washington Office Amendment 6109.11, Exhibit 19, page 1.

- LEO's will investigate all accidents that involve the Forest Service

and result in death, injury, illness, and/or property damage. Forest Service Manual (FSM) 6730.3; Exhibit 19, page 3.

18. Ms. Gosse failed to contact anyone or take any action of any kind in response to the reported bear attack on Mr. Francom. Consequently, no one else employed by the Forest Service knew about the incident, and, as a result, no action was taken by Defendant to warn potential campers about the bear attack.

19. The DWR has a three-level classification system for bears that constitute a threat to the public. The highest classification, Level III, is for bears that have shown no fear of humans, displayed aggressive behavior toward humans, and are deemed a threat to public safety. The DWR requires that Level III bears be destroyed because of the risk to public safety.

20. At approximately 10:00 a.m. on June 17, 2007, the DWR classified the bear that attacked Mr. Francom as a Level III nuisance bear.

21. The DWR, through Dennis Southerland and Luke Osborn, responded to the Francom incident on June 17, 2007, by pursuing the bear with dogs. They tracked the bear for approximately four to five hours, but the search was unsuccessful.

22. After the DWR ended its search for the bear at approximately 5:00 p.m. on June 17, 2007, Mr. Southerland made plans to return to the Francom campsite the next morning, June 18, 2007. He intended to set a trap for the bear because it continued to be a threat to public safety and because the Francom campsite was the best place to attempt to trap the bear.

23.     Mr. Osborn acknowledged that if a bear found food in a certain location, such as the Francom campground, it would likely return to that location if the attractant was still there.

24.     There was no one at the campsite when DWR ended the search, and Mr. Southerland did not think that anyone would camp at that site that evening because it was already 5:00 p.m. on a Sunday.

25.     If, however, anyone did camp there on June 17, 2007, the State of Utah acknowledged that the scent of humans and/or their food could attract the bear back to the Francom campsite.

26.     Tim Clark, Forest Supervisor over the Uintah National Forest, was Carolyn Gosse's immediate supervisor.  Mr. Clark lived in Heber City at the time and was on duty on June 17, 2007.

27.     Mr. Clark credibly testified that, if Ms. Gosse had told him about the Francom bear attack, he would have immediately responded by going to the area and warning campers in and around the Francom campsite (as well as people in the Timpooneke Campground) about the dangerous bear.

28.     Mr. Clark also would have informed John Sheely, the camp host at Timpooneke Campground, about the bear attack.

29.     John Logan was the Forest Service District Ranger over the relevant area.  Mr. Logan testified that a warning about the dangerous bear could easily have been placed on the gate at the head of Timpooneke Road 056, or that the whole area could have been closed off by simply closing the gate at the head of the

Timpooneke Road 056. Alternatively, the specific Francom campsite could have been closed by Defendant by taping off the campsite with yellow tape.

30. Unfortunately, on the evening of June 17, 2007, the Mulvey Family (Tim Mulvey, Rebecca Ives, J.M., and Sam Ives) camped in the same campsite where Mr. Francom had been attacked earlier that morning.

31. The Mulvey family passed through Timpooneke Campground on their way to the campsite. They stopped and spoke with the Timpooneke Campground host, John Sheely, on their way to the campsite. Mr. Sheely had not been informed of the Francom attack at the time he spoke with the Mulvey family, and therefore he did not inform them about the bear.

32. The cost to camp in the Timpooneke Campground was $13, and Mr. Mulvey did not have $13 with him. When Mr. Mulvey asked if they could camp up the road without paying the $13 fee, Mr. Sheely replied that it would be fine.

33. Mr. Sheely would have informed the Mulvey family of the Francom attack if that information had been reported to him.

34. The Mulvey family would not have camped in or anywhere near the area of the Francom campsite if they had been informed about the Francom attack. They would have returned home if they had known of the Francom attack.

35. Not knowing of the bear attack just twelve hours earlier at that very site, the Mulvey family set up camp at the Francom campsite and cooked dinner.

36. During or after dinner at the campsite, Rebecca Ives drank a 22oz. beer. Certain government witnesses testified that Ms. Ives smelled of alcohol, implying a much

greater consumption than a single 22 ounce beer. The court finds, however, that Ms. Ives' and Mr. Mulvey's testimony on this point was wholly credible. In any event, the court finds that any alcohol consumption by Ms. Ives did not affect the events that occurred that night.

37.     After dinner, the Mulvey family cleaned the campsite, placed their coolers and garbage in their vehicle, and went to bed around 9:00 p.m. in a single tent. The tent had two "rooms." One was a larger compartment and the other was a smaller compartment, which was separated from the larger compartment by a thin nylon flap.

38.     Mr. Mulvey and Ms. Ives slept in the larger tent area, with J.M. in between them, and Sam slept in the smaller area.

39.     Sam Ives, without permission from his parents, ate a South Beach granola bar and placed the wrapper in a storage compartment of the tent.

40.     There was also an open can of Coke Zero in the Mulvey tent, but it is unclear who brought the Coke Zero into the tent.

41.     Later that evening, a bear entered the campsite, pulled Sam Ives from the family tent, and killed him.

42.     Based on the testimony of Jake Francom, Luke Osborn, Dennis Southerland, along with other evidence at trial, Plaintiffs have demonstrated to a convincing degree that the bear was the same bear that had attacked Mr. Francom earlier that morning.

43.     Prior to Sam's disappearance from the tent, Mr. Mulvey had heard Sam say

something about a neighborhood friend, and Mr. Mulvey thought Sam was talking in his sleep. Then he heard Sam yell, "help me." Mr. Mulvey immediately ran out of the tent. In the darkness, he did not see or hear Sam. He soon saw that the tent had been slashed open, and Sam was not in the tent. Ms. Ives, in the meantime, had joined her husband, but Sam was no where to be seen.

44. After looking around the immediate area, Mr. Mulvey left to notify the campground host, Mr. Sheely, that someone had taken his son. Meanwhille, Ms. Ives stayed at the campsite with her young son, J.M., and built up the fire in case Sam was trying to find his way back.

45. Some time later, after law enforcement and the DWR were notified and a search had begun, Sam's body was found approximately 400 yards away from the campsite.

46. When not unduly burdensome, the Forest Service has an obligation to warn visitors to National Forest Service lands of known incidences in the immediate area of aggressive bear behavior toward humans that constitute a threat to public safety.

47. In this case, however, Defendant provided no warning to the Mulvey family about the Francom attack, nor was the specific campsite closed.

## CONCLUSIONS OF LAW

1. The Federal Tort Claim Act's ("FTCA") waiver of immunity is limited to causes of action against the United States arising out of certain torts committed by federal employees acting within the scope of their employment. *See United States v.*

*Orleans*, 425 U.S. 807, 813 (1976).

2.	Under the FTCA, the government is liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674 and "in accordance with the law of the place where the act ... occurred." 28 U.S.C. § 1346(b)(1). Thus, the court looks "to state law to resolve questions of substantive liability." *Miller v. United States,* 463 F.3d 1122 (10th Cir. 2006).

3.	The court previously ruled, in a January 30, 2009, Memorandum Decision and Order, that the discretionary function exception to the FTCA does not apply to the United States' failure to warn about the earlier bear attack because it did not involve considerations of public policy. Based on the evidence presented at trial, the court reaffirms that decision, and thus finds that the United States is not immune from liability in this case.

4.	Specifically, in the court's January 30, 2009 Memorandum Decision, the court recognized that *Berkovitz v. United States*, 486 U.S. 531 (1988), delineates a two-part test for determining whether the FTCA's discretionary function exception under 28 U.S.C. §2680(a) applies to a claim. The court held that Plaintiffs had satisfied the second prong of *Berkovitz,* thereby subjecting the United States to liablility.

5.	Based on the evidence presented at this trial, the court now holds that Plaintiffs have also satisfied the first prong of *Berkovitz*. The court's January 30, 2009 Decision had stated that Plaintiffs did not satisfy the first prong of the *Berkovitz* test because the relevant regulations presented by Plaintiffs did not specifically

prescribe a course of action. However, at trial, Plaintiffs proved that Ms. Gosse violated the following regulations, which provide a specific course of conduct: Washington Office Amendment 6109.11, & Forest Service Manual (FSM) 6730.3. These two regulations required Ms. Gosse to have taken action in response to the attack on Mr. Francom, and Ms. Gosse failed to take any action after being notified of the attack. The court therefore concludes that the discretionary function doctrine is inapplicable under the first prong of the *Berkovitz* test as well as under the second prong.

6.   To establish a claim of negligence in Utah, a plaintiff is required to establish four elements: (1) that the defendant owed the plaintiff a duty, (2) that the defendant breached that duty, (3) that the breach of duty was a cause of the plaintiff's injury, and (4) that the plaintiff in fact suffered injuries or damages. *Webb v. University of Utah*, 125 P.3d 906, 909 (Utah 2005).

7.   On June 17, 2007, it was foreseeable that the Francom bear would return to the campsite where it had earlier attacked campers and had found food.

8.   Plaintiffs have proved by a preponderance of the evidence that Defendant's employees owed Plaintiffs a duty to warn them about the earlier incident, whether the warning was oral, by posting signs on the gate of Timpanooke Road 56, and/or by roping off the specific campsite.[7] This is particularly true when it

---

[7] The court notes that this finding of a duty and a breach of the duty is limited to the unique facts presented in this case. The court makes no ruling on whether a duty to warn would arise or be breached in a slightly different situation, such as if the campers had been at a nearby–but not the same--campsite as the earlier bear attack or if the

became known that they were going to camp at a dispersed campsite, and the most likely dispersed site would be the very site where there had been an aggressive bear encounter just twelve hours prior.

9.    Specifically, Ms. Gosse had a duty to follow up with the Francom attack by contacting her supervisor and others in the Forest Service who could address the problem if she was unable to respond, to confirm that the camp host at the nearest campground knew the details of the Francom attack, to make sure that potential campers in the area were warned about the attack, and to contact someone in the Forest Service who could make a determination about whether to close either the Francom campsite or Timpooneke Road 056.

10.    Ms. Gosse also had a duty to contact the DWR so that the U.S. Forest Service and the DWR could act jointly.

11.    Plaintiffs have also proved by a preponderance of the evidence that Defendant breached its duties by not warning the Mulvey family, or providing warning to those who would have communicated the warnings to the Mulvey family.[8]

_____

campers had camped at the site several days after an aggressive bear encounter. The ruling here is limited to a situation where (1) there had been an aggressive bear encounter at the identical site where Plaintiffs set up camp; (2) the encounter had been approximately twelve hours before Plaintiffs arrived; and (3) it would not have been onerous for Defendant to have warned Plaintiffs about the earlier attack (i.e., campers heading to the dispersed sites had to travel through the designated campground check-in point; there was a gate to which a sign could have been posted; a sign could have been posted at the campsite itself; or the campsite could have been roped or taped off).

   [8] To the extent Plaintiffs contend that Defendants had a duty to close the gate to the entire dispersed camping area, the court finds that the failure to close the gate involved a policy decision that is protected under the discretionary function exception to

14

12.     Plaintiffs have proved by a preponderance of the evidence that Defendant's

        breaches were a cause of Sam Ives' death and the Plaintiffs' damages.

13.     Plaintiffs have proved by a preponderance of the evidence that they have, in

        fact, suffered damages due to Defendant's breach of its duty.

14.     Defendant has failed to prove by a preponderance of the evidence any

        intervening/superseding cause of the Plaintiffs' injuries.  *See Bansanine v.*

        *Bodell*, 927 P.2d 675 (Utah Ct. App. 1996);

15.     Under Utah's Comparative Fault statute, the court is required to allocate fault

        among all negligent actors, including non-parties, such as the State of Utah.  *See*

        78B-5-818(3).  The court must state the percentage of fault for each actor whose

        negligence has been determined, by a preponderance of the evidence, to be a

        "cause" of Sam Ives' death.  A negligent actor/entity is responsible only for that

        amount attributable to it.

16.     Defendant has proved by a preponderance of the evidence that some fault must

        be allocated to the State of Utah and the Mulvey family.[9]

17.     The court finds that the State of Utah, through the DWR, is 25% at fault for

        failing to communicate with the Forest Service.  While it was Defendant's duty to

        warn the public, the DWR had a duty to communicate its designation of the bear

        as Level III bear, the fact that the search for the bear was unsuccessful, and that

_____

the FTCA.

        [9] Defendants previously filed a Notice of Allocation of Fault, which is required
when fault may be allocated to a non-party.  *See* Docket No. 35.

the DWR intended to return the following morning to set a trap for the bear at that campsite.

18.    While the court recognizes that Mr. Francis, Mr. Mulvey, and Ms. Ives have suffered an almost unbearable, unimaginable loss, the court would be abdicating its responsibility if it failed to allocate any fault whatsoever to Sam and his parents because of the food that was found in the family tent.[10]  When camping in known black-bear country, it is of the utmost importance to ensure that food and trash is properly stored.  While it is certainly possible that the granola bar and the can of Coke Zero played no role in Sam's tragic death, the court, under a preponderance of the evidence standard, cannot so rule.  Therefore, the court attributes 10% of the fault to Sam, Mr. Mulvey, and Ms. Ives, collectively.

19.    The remaining 65% of fault is attributed to the United States.

20.    While Plaintiffs' tragic loss is unquantifiable, the court must assign a monetary value to Plaintiffs' loss of comfort, society, love, companionship, advice, and affection in some realistic manner based on the evidence adduced at trial.  *See Jones v. Carvell*, 641 P.2d 105 (Utah 1982).

21.    Plaintiffs' recovery from the United States is limited to $2,000,000 due to the amount stated in their administrative claim.  *See* 28 U.S.C. § 2675(b).  This amount, however, is not the cap for the total damage amount award calculated

---

[10]  The question of whether Sam Ives contributed to his own death is judged by what a reasonable eleven-year-old child would do under the same or similar circumstances.

by the court but the cap for the United States' liability. *See Zurba v. United States*, 318 F.3d 736 (7th Cir. 2003).

22. While recognizing that no amount of money will ever compensate Plaintiffs for their loss of their son, the court concludes that a fair award, given other cases of which this court is aware, is $3,000,000. *See e.g., Calder v. Blitz*, Case No. 2:07CV387 (Utah D. Ct. Nov. 2011) ($3,000,000 damage award after jury trial for wrongful death of child);[11] *Haceesa v. United States*, 309 F.3d 722, 724 n.1 (10th Cir. 2002) (district court's calculation of damages for death of a child due to medical malpractice totaled $3.3 million, before being reduced on appeal due to a medical malpractice cap).

24. Because 65% of the fault has been allocated to the United States, Plaintiffs are awarded 65% of the $3,000,000 damage calculation, which totals $1,950,000.

25. Under the FTCA, Plaintiffs are not entitled to a separate award of attorneys' fees or costs of suit. *See* 28 U.S.C. § 2678.

26. Under the FTCA, Plaintiffs are not entitled to prejudgment interest. *See* 28 U.S.C. § 2674

## ORDER

Accordingly, for the foregoing reasons, the Clerk of the Court is directed to enter Judgment against the United States of America and in favor of Plaintiffs Kevan Francis and Rebecca Ives in the amount of $1,950,000.

---

[11] *See Calder v. Blitz U.S.A., Inc.*, 2:07CV387, Special Verdict, Docket No. 450, dated November 10, 2010.

DATED this 3rd day of May, 2011.

BY THE COURT:

_____

DALE A. KIMBALL
United States District Judge